2021 IL App (2d) 190910-U
No. 2-19-0910
Order filed December 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-3361 |
| KENNETH S. SEPLAK, | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We reject defendant's challenge to the length of his sentence for first degree murder and affirm the trial court's judgment.

¶ 2   A jury convicted defendant of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) in relation to the 2016 shooting death of David Gorski. The trial court sentenced defendant to 78 years' imprisonment, which included a 25-year sentence enhancement (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016)) based on the jury's separate finding that defendant personally discharged the firearm that caused Gorski's death. Defendant appeals, contending his sentence was excessive. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. The Charges

¶ 5    Around 11:25 p.m. on December 23, 2016, police officers found Gorski unresponsive in the driver's seat of his vehicle, which was parked in the median of Milwaukee Avenue in Libertyville, just north of its border with Vernon Hills. He had been fatally struck by a .38-caliber bullet that traveled through his right arm, into his chest cavity, and through his heart. No weapons or shell casings were found on the roadway in the immediate vicinity of Gorski's vehicle, and, other than a broken front-passenger window, Gorski's vehicle had no damage. The Lake County Major Crimes Task Force investigated the shooting and learned that, just before his death, Gorski had been on a date with Sandy Moreno at the AMC movie theater at Hawthorn Mall in Vernon Hills, which was less than one-half mile south of where the police found Gorski. Around 3:45 a.m. on December 24, 2016, task force investigators spoke with Moreno. The investigators asked Moreno whether there was anyone who may have wanted to harm her or Gorski. Moreno told them about defendant.

¶ 6    A grand jury later indicted defendant on three counts of first degree murder. Before trial, defendant indicated he would rely in part on self-defense.

¶ 7                                B. The State's Evidence

¶ 8                         1. *Defendant and Moreno's Relationship*

¶ 9    In 2014, defendant met Moreno, who was married to and had children with another man, while delivering beer to the Thornton's gas station in Island Park where Moreno worked. Over the next couple years, defendant and Moreno became friendly, and Moreno gave defendant her phone number. In 2015, they began exchanging text messages and saw each other socially a few times.

¶ 10 Text messages between defendant and Moreno that were admitted at trial showed defendant was infatuated with Moreno and expressed his feelings for her on several occasions. Moreno sent him mixed signals. At times, she made her intentions clear—she was not looking for a relationship but was "down to hang out" and talk. But she also sent defendant flirtatious text messages, agreed to see him socially at a movie, for lunch, and at a White Sox game, asked him for gifts such as lingerie, a laptop computer, and a ring, and asked him to loan her money.

¶ 11 Defendant gave Moreno approximately $13,000 in various increments over the next several months. Once he began giving her money, defendant's texts to Moreno increased in frequency and, at times, expressed sexual desire for Moreno. In September 2016, Moreno told defendant she did not want to have sex with him, would return the gifts he had bought her, and incrementally pay back the money he had lent her. Defendant's texts to Moreno became incessant, leading her to block his number in September 2016. He texted her 196 times after she blocked him. He told her that he felt "cheated" because he had showered her with gifts and money but she refused his sexual advances. She did not respond to any of his texts other than to tell defendant to stop harassing her and that she would contact him only when she could make a payment to him. He nevertheless continued to text her and showed up at the gas station without invitation on several occasions while Moreno was working. Though Moreno had not given him her address, he also left a note on her car when it was parked outside her apartment.

¶ 12 *2. Moreno and Gorski's Date*

¶ 13 On December 23, 2016, Moreno was in a nonexclusive dating relationship with Gorski. They agreed to meet at the AMC theater in the Hawthorn Mall, see a movie together, and then meet at Gorski's apartment in Libertyville. Moreno made two stops before driving to the theater and arrived at the theater around 8 p.m. Around 10:54 p.m., Moreno and Gorski left the theater

together and walked separately to their cars. As Moreno prepared to leave, she saw Gorski standing outside his vehicle, likely smoking a cigarette. She drove past his car as she left the parking lot and did not see anything unusual or concerning. Moreno drove to Gorski's apartment and, when he did not arrive and she could not contact him, she left.

¶ 14                          3. *Defendant's Initial Statement*

¶ 15    After speaking with Moreno, around 6 a.m., task force investigators knocked on the door of defendant's home, and defendant agreed to go to the station to speak with them regarding his activity on December 23. At the station, defendant waived his *Miranda* rights and told investigators he had not left his house all day other than to get gasoline, had his phone with him the entire day, and only he drove the gold sport utility vehicle (SUV) that was parked in front of his home. He told the officers he had sent three text messages to Moreno while at home and also spoke to his friend, Keith Garcia, who lived in Antioch, about a snowmobile he had damaged. Defendant told the officers he had met Moreno through his work and that he and Moreno were in an exclusive dating relationship but had not yet been intimate, though they "were working towards that." He also told the officers he had loaned Moreno approximately $13,000 and that he trusted she would pay him back. He also acknowledged he may have sent "too many" text messages to Moreno, which likely made her uncomfortable. Defendant consented to a physical search of his smartphone, and, later, the State obtained a search warrant to extract data from it.

¶ 16                          4. *Location Data Analysis and Video Surveillance Footage*

¶ 17    Analysis of the data on defendant's phone showed he had not been truthful about his activities on December 23. The data showed that, around 7:20 p.m. on the night of the shooting, defendant left the vicinity of his home in Round Lake Beach and drove to the vicinity of Moreno's apartment in Wauconda, arriving around 7:40 p.m. He texted Moreno and remained there

momentarily. He then traveled east to Libertyville, arriving there around 8 p.m., before traveling south and arriving in the vicinity of the AMC theater at the Hawthorn Mall around 8:10 p.m. Defendant remained in that vicinity until approximately 8:47 p.m., during which time he texted Moreno about a vehicle she was trying to sell and to "stop ignoring" him. The data further showed defendant then traveled back home and arrived there around 9:17 p.m.

¶ 18 At 10:07 p.m., defendant left home and traveled back to the vicinity of the theater, arriving around 10:36 p.m. He remained there until 10:59 p.m. He then traveled north on Milwaukee Avenue to just north of the crime scene before traveling back near the theater, arriving at 11:03 p.m. He again traveled north on Milwaukee Avenue, past the crime scene, and again returned to the vicinity of the theater around 11:17 p.m. Defendant then traveled to his home, arriving around 11:42 p.m., and, around 11:49 p.m., defendant left and traveled to the vicinity of Garcia's home in Antioch, arriving there around 12 a.m. Defendant remained near Garcia's home until 1:12 a.m. He then traveled close to Moreno's apartment before traveling back home, arriving there at 2:04 a.m.

¶ 19 The task force also obtained video surveillance footage of the parking lot near the theater and from nearby businesses along Milwaukee Avenue. The footage corroborated the location analysis of defendant's phone. It showed an SUV that was consistent with defendant's travel about the parking lot near the theater around 8:30 p.m. and 10:35 p.m. It also showed the SUV turning around at a business just north of the crime scene at 11:01 p.m. and traveling back south on Milwaukee Avenue. Around 11:15 p.m., the SUV traveled north on Milwaukee Avenue, past the crime scene, before traveling south a short time later.

¶ 20 *5. Keith Garcia*

¶ 21 At trial, Garcia testified that, around 11 p.m. on the night of the shooting, defendant called and asked him to hold something for defendant. Defendant told Garcia he was near the Wisconsin

border and would arrive in 30 or 40 minutes. Defendant arrived at Garcia's residence shortly after midnight, and they conversed about snowmobiles. Eventually, they went inside Garcia's garage, and defendant pulled out of his coat a large Ziplock-type bag containing a revolver and a box of ammunition, handed it to Garcia, and asked Garcia if he "would hold" it. Garcia asked defendant why, and defendant told him he had been "shooting towards a tree, and it accidentally went off and it may or may not have hit a house." When Garcia asked defendant where it happened, defendant told him "somewhere in Wisconsin." Defendant did not tell Garcia he had fired the weapon in self-defense. Garcia took the revolver, which was fully loaded with live ammunition except for a single spent casing. He emptied the cylinder and put the ammunition back into the box. (The box and four rounds of ammunition were later determined to have latent palmprints and fingerprints from Garcia on them. No latent prints from defendant were on the revolver, box, or ammunition.)

¶ 22 After he unloaded the revolver, Garcia continued to handle it. Defendant told him not to do so, asked for the revolver, and wiped it down with his shirt before placing it back in the bag. Garcia then placed the bag under the driver's seat of a vehicle in the garage. Also in that vehicle was a large quantity of marijuana, for which Garcia later pleaded guilty to reduced charges in exchange for a sentence of 18 months' probation. (As a condition of his plea, Garcia was also required to provide truthful testimony in the instant case.)

¶ 23 On the morning of December 24, 2016, Garcia's girlfriend woke him and told him detectives were there to speak with him. He got dressed, used the restroom, and went downstairs to speak with the detectives. The detectives asked Garcia whether he knew defendant, and he responded affirmatively. Garcia told the detectives that defendant had been there the night before,

but, when asked whether defendant had left anything at his house, Garcia told them "no," fearing, if he told the detectives otherwise, they would find the marijuana.

¶ 24    The detectives told Garcia they would obtain a search warrant for the residence. While the task force was waiting for the warrant, Garcia took an investigator to his garage, where he removed the marijuana and the bag with the revolver and ammunition from the vehicle. He was then transported to the police department, and the police placed him in a holding cell near defendant's cell. Defendant and Garcia conversed, and defendant told Garcia "this [was] over a girl" who had been "messing around" on him, despite the fact he had helped her out financially.

¶ 25                           6. *Defendant Exculpates Garcia*

¶ 26    While defendant was being booked, he told an officer that Garcia "had nothing to do with this" or "didn't do anything." Later, while defendant was in a holding cell, he called for a detective. When a detective checked on defendant, defendant told the detective that Garcia "had nothing to do with this charge."

¶ 27                           7. *Forensic Evidence*

¶ 28    An evidence technician who was present for Gorski's autopsy collected a fired bullet that was extracted by the medical examiner. The fired bullet was later analyzed by a firearm and toolmark identification expert, who concluded the bullet recovered from Gorski's body was fired from the firearm recovered from Garcia's home, *i.e.*, the revolver defendant asked Garcia to hold.

¶ 29    Additionally, an evidence technician collected gunshot residue (GSR) kits from defendant's hands and both the inside and outside of defendant's SUV. The evidence technician also collected a shirt from defendant's bedroom and a GSR kit was later collected from each cuff. A microscopy and trace chemistry expert analyzed the GSR kits and determined GSR was present on the inside of the SUV, near the front left window, and on the left cuff of the shirt. However,

GSR was not found on the kits collected from defendant's hands or the outside of his SUV. At trial, the expert explained that, when GSR is not found on a sample taken from a person, it means the person may not have discharged a firearm and, if he or she did, then GSR was either not deposited, removed by activity, or not detected. When GSR is not found on a sample taken from an object, it means the object "may not have contacted a [GSR-]related item or [been] in the environment of a discharged firearm" and, if it was, then GSR was either not deposited, removed by activity, or not detected.

¶ 30                                B. Defendant's Evidence

¶ 31    Defendant testified he met Moreno in 2014 while delivering beer for the Fred W. Losch Beverage Company and became friendly with her, and, in 2015, they exchanged phone numbers and began texting each other. They saw each other socially, and Moreno introduced him to her daughter. Defendant also gave Moreno gifts, including a laptop computer, lingerie, a watch, and a diamond promise ring, and loaned her money, including $4500 for attorney fees and costs related to her divorce. He also had been making payments on the car she was driving on December 23, 2016. When Moreno accepted the promise ring and money for attorney fees, defendant interpreted that to mean Moreno was not dating anyone else and that they were "going to be together."

¶ 32    In September 2016, while at dinner at a restaurant in Round Lake Beach, defendant told Moreno that he would be laid off in late October or early November. He also told Moreno he would not be able to loan her money until he got a new job. Moreno told him, "that sucks," and looked disappointed. After that date, defendant noticed a difference in the way Moreno responded to his text messages—Moreno now sent him one- or two-word responses as opposed to "actually communicating" with him. On September 21, 2016, Moreno sent defendant a text message, telling defendant she could not talk to him because of her divorce. He continued to visit her at Thornton's,

however, and Moreno never told him that she had blocked his texts or that she did not want to see him again.

¶ 33    Defendant also testified that, in 2015, Garcia gave him the revolver used to kill Gorski as partial payment of a loan defendant had made to Garcia. Defendant kept the revolver in his beer truck until he was laid off, at which time he put it in his SUV and "forgot about it."

¶ 34    On the night of the shooting, he drove to Moreno's home in Wauconda because he wanted to talk to her. At the time, he did not know Moreno was dating Gorski and had never seen him before. As defendant approached Wauconda, he saw Moreno driving alone in the opposite direction. He turned around and followed her. At trial, he explained why—"she [had] told [him] she had no money and that she was spending time with her kids, and then here she [was] driving off and her kids [were not] with her and it's Friday night."

¶ 35    Once at the theater, he parked and observed Moreno walk inside alone. He texted her a few times and then returned home. At home, he shoveled snow off his driveway and then began contemplating who Moreno was with at the theater. So, defendant drove back and parked "three or four aisles over" from where Moreno was parked.

¶ 36    When the movie let out (defendant had checked the movie times and knew the approximate time Moreno would be leaving), defendant saw Moreno walking side-by-side with "a pretty big guy" he had never seen before (whom he later learned was Gorski). Defendant watched Moreno get into her car and drive away and then saw Gorski standing outside his car, smoking a cigarette. Defendant got out of his SUV, approached Gorski, and said, "I seen [*sic*] you are walking out here with [Moreno]. What's going on? What are you doing here?" Gorski responded, "what's it to you[?] [Why] is it any of your business[?]" Defendant told Gorski he had been dating Moreno, supporting her and her kids, had given her a ring and paid for the car she was driving, and wanted

to know what was going on. Gorski laughed and told defendant he and Moreno had been dating for awhile and that she had obviously been "playing [defendant] for [his] money and spending it on [Gorski]." Defendant then said, "So you're getting the money that I have been giving to her? Are you going to pay me back the $13,000 that she owes me?" Gorski took a drag from his cigarette, answered "hell, no," told defendant to "get lost," and then blew smoke in defendant's face. Defendant called Gorski an "asshole," and, in response, Gorski shoved him in the chest, knocking defendant to the ground. Defendant got up, and Gorski "starting coming at" him. The two grappled for a moment and, when Gorski began overpowering defendant, causing defendant fear, defendant kneed Gorski in the groin. Gorski let go of defendant, and defendant pulled away and ran to his vehicle. Before getting in, he heard Gorski say, "You're dead."

¶ 37　　Defendant backed out of his parking space and drove to Ring Road (which provided access to the mall), where he turned right toward Milwaukee Avenue. As defendant approached the stoplight, Gorski "came flying up alongside" him, honking his horn. Defendant and Gorski turned north onto Milwaukee Avenue. Gorski accelerated past defendant and then slowed down to block defendant's path. Defendant was scared and "wanted to get away" from Gorski, so he drove over the curb on the right side of the road. Defendant returned to the road and Gorski again pulled alongside him, honking his horn. At that point, defendant remembered the revolver was in his center console. Defendant grabbed the revolver with his right hand, put it in his left, rolled down the window, and displayed it in an attempt to get Gorski to "back off." Gorski swerved toward defendant. Not wanting to get hit, defendant went over the curb again. He then swerved back onto the roadway to avoid a group of trees, and he was "flung" into the driver's door, at which time the "gun went off." Before the gun went off, defendant saw an unidentified object in Gorski's right

hand. He was not aiming the gun at Gorski. Defendant did not remember pulling the trigger but recalled hearing a bullet "hit something" that sounded like glass.

¶ 38    Defendant continued north on Milwaukee Avenue and saw Gorski's car stop in the median. Defendant turned around and drove back south on Milwaukee Avenue, past Gorski's car, trying unsuccessfully to see whether Gorski was okay. Defendant was in shock and was not sure whether he drove past Gorski a second time. He stayed in the area, retrieved his phone, and called Garcia. He then drove to his house so that he could talk with his parents. They were asleep, so defendant collected a box of bullets and drove to Garcia's house. Once there, he told Garcia what had just happened and asked Garcia to take the revolver and the box of bullets. Garcia took the revolver and bullets and went into his garage. In all, defendant stayed at Garcia's home for about an hour. After defendant left, he "drove around for a few minutes," including to Moreno's home, and then went home.

¶ 39                    C. The State's Rebuttal Evidence

¶ 40    In rebuttal, the State called two witnesses, two of Gorski's friends, who testified that Gorski was nonconfrontational and had a reputation for peacefulness.

¶ 41           D. Jury Instructions, Verdict, and Defendant's Motion for New Trial

¶ 42    In addition to receiving instructions on the offense of first degree murder, the jury received instructions on second degree murder, involuntary manslaughter, and self-defense. The jury found defendant guilty of first degree murder. It also found the State had proved defendant personally discharged the firearm that caused Gorski's death.

¶ 43    Defendant moved for a judgment notwithstanding the verdict and, in the alternative, a new trial. The court denied the motion.

¶ 44                        E. Sentencing

¶ 45    A presentence investigation report (PSI) indicated that defendant was born in August 1979, making him 40 years old at the time of sentencing. Defendant lacked a significant criminal history, which consisted of one traffic and one cannabis-related offense committed while he was a juvenile, and one cannabis-related ordinance violation that occurred in 1999. Defendant was sentenced to court supervision for each of his prior offenses, and he satisfactorily completed each sentence.

¶ 46    Defendant lived with both his parents, who had been married for more than 40 years. He described his home life as "functional." According to the PSI, defendant's parents worked hard and passed their work ethic on to him and his sister. Defendant earned his high school diploma through a correspondence program and then attended some classes in architecture and drawing at a local community college. At the time of the offense, defendant was unemployed, having just been laid off after 11 years of employment. His parents described him as "hard-working" and reported he got his first job at age 15 and had been steadily employed since he was a teenager. His parents also described him as "good-hearted, charitable, [and] helpful at home and with others" and reported he was a talented artist and mechanic.

¶ 47    At sentencing, the State presented victim-impact testimony from Gorski's mother, father, and sister, as well as written statements from several other family members, friends, acquaintances, and coworkers. The victim-impact evidence generally demonstrated the positive impact Gorski had while he was alive and the negative impact that was caused by his death.

¶ 48    In mitigation, defendant's mother testified that defendant, who lived at home with her and his father, supported them by helping around the house, doing tasks that his father was not able to do because of his age. He also helped his friends and would loan them money, not caring whether he was paid back. According to defendant's mother, defendant had a "good" relationship with his friends and family and was not confrontational or violent.

¶ 49    Defendant's mother further testified that he was a good student and had a "very good" work ethic, which resulted in several bonuses and work promotions. According to defendant's mother, he applied for unemployment benefits when he was laid off but was scheduled to start new employment in January 2017.

¶ 50    The State argued a sentence "in the high 50s, at or near 60 [years]" was appropriate in this case. The State emphasized the cold-blooded nature of the murder and the fact that Gorski was an innocent party who "had no idea what was lurking in that parking lot" when he left the theater. It also noted defendant was 37 years old when he committed the offense and was not a teenager who made a rash, split-second decision; rather, the State asserted, defendant "made hundreds of decisions that night" that led to him to murder Gorski. According to the State, defendant stalked Gorski like he was prey. The State asserted defendant made those decisions despite the positive influence of his family. The State also noted defendant lied to the police after the shooting. The State addressed the statutory mitigation factors, noting only one mitigating factor applied: defendant's lack of criminal history. The State argued a lengthy sentence was necessary to deter others from committing similar crimes and that defendant was a danger from which the community was in need of protection.

¶ 51    The defense argued the minimum sentence, *i.e.*, 45 years' imprisonment, was appropriate. The defense asserted the minimum sentence was "a very, very long time" for a man of defendant's age and noted the fact defendant had fired only one shot. It disagreed with the State's assertion that defendant stalked Gorski, noting there was no evidence that defendant even knew who Gorski was before he walked out of the theater. The defense emphasized defendant's lack of criminal history, noting it consisted only of minor offenses committed in his youth and for which he was

sentenced to, and successfully completed, court supervision. It also highlighted defendant's willingness to help his family and friends.

¶ 52    In allocution, defendant stated he understood what Gorski's family "was going through," but also told the court that what the assistant state's attorney had said regarding the circumstances of the crime was "not true."

¶ 53    The court sentenced defendant to 78 years' imprisonment, which included a 25-year enhancement based on the jury's finding that defendant personally discharged the firearm that caused Gorski's death. The court noted it had considered the PSI, the evidence at trial, the evidence in aggravation and mitigation, the statutory factors in aggravation and mitigation, and both the punitive and rehabilitative aspects of sentencing. The court emphasized the senseless nature of defendant's acts, noting he had murdered "a perceived romantic rival, a rivalry, frankly, that existed only in [defendant's] head." The court also noted that, in addition to destroying his own life, defendant had destroyed the lives of two families, the Gorskis and his own. Further, the court found defendant had fabricated the story he told on the stand, as it was not corroborated by "anything that would even look like credible evidence," stating it was "utter nonsense" that "was completely and wholly rejected by the jury." The court found mitigating defendant's "relatively crime-free life" but nevertheless found defendant was an "exceptionally dangerous man" as evidenced by the cold-blooded nature of the murder.

¶ 54    Defendant moved to reconsider sentence, and the court denied the motion. This appeal followed.

¶ 55                                  II. ANALYSIS

¶ 56    On appeal, defendant contends the trial court abused its discretion in imposing a 78-year sentence. Specifically, he argues the sentence, which was 33 years more than the minimum and

was essentially a life sentence given defendant's age, was excessive given his nonconfrontational nature, his minimal criminal history, and his education, employment history, and family history, all which demonstrated he had rehabilitative potential.

¶ 57    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of [the] defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 58    The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, the trial court has broad discretionary powers in imposing a sentence, which are entitled to great deference. *Id.* at 212. We do not reweigh the evidence in aggravation and mitigation or substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Instead, we will overturn a sentence only when the trial court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 59    We conclude the trial court did not abuse its discretion when it sentenced defendant to 78 years' imprisonment. The offense of first degree murder carries a statutorily mandated sentencing

range of 20 to 60 years' imprisonment. 720 ILCS 5/9-1(a) (West 2016); 730 ILCS 5/5-4.5-20(a) (West 2016). And when, as here, the defendant is found to have personally discharged a firearm that caused the victim's death, he or she is subject to an enhancement of 25 years to natural life. *Id.* § 5-8-1(a)(1)(d)(iii). Thus, the applicable range here was 45 years to natural life. Because defendant's 78-year sentence fell within that range, we presume the sentence is proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if defendant makes an affirmative showing the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has not made such a showing.

¶ 60    Defendant argues the evidence in aggravation and mitigation did not justify such a severe sentence. He points out that, throughout trial and at sentencing, he was described as an introverted and nonconfrontational person, which was reflected in his minimal, nonviolent criminal history. He maintains his minimal criminal history, when viewed with his education, steady employment history, and close relationship with his elderly parents, whom he helped around the house, demonstrated he had rehabilitative potential that did not warrant a sentence 33 years in excess of the minimum. He asks that we either remand this matter for a new sentencing hearing or reduce his sentence to one that is "closer to the still substantial minimum," which "offers the greatest balance of punishing [defendant] and allowing for the potential of restoring him to a productive place in society."

¶ 61    Defendant essentially asks this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. We decline to do so. *Stacey*, 193 Ill. 2d at 209.

¶ 62    Moreover, the record contains no indication that the trial court failed to appropriately consider the mitigating evidence to which defendant points on appeal. Indeed, there exists a presumption the court considered all mitigating factors supported by the record, absent some affirmative indication, other than the sentence itself, to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. And the court "need not detail precisely for the record the exact thought process undertaken to arrive at the ultimate sentencing decision or articulate its consideration of mitigating factors." *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32. Here, the record shows all the mitigating evidence upon which defendant relies was before the court in the evidence presented at trial, at sentencing, and in the PSI. The court stated it had considered everything it had been presented in reaching its sentence, specifically mentioning defendant's lack of criminal history and his mother's testimony at sentencing, which emphasized defendant's positive familial relationships, his education, and his employment history. That the court did not articulate its consideration of defendant's education, employment history, and familial relationships does not mean the court did not consider that evidence as mitigating. See *id.*

¶ 63    Further, defendant has not pointed to anything, other than the length of the sentence itself, showing the trial court did not adequately consider the mitigating factors present in the record. Indeed, he argues his 78-year sentence, "which is 33 years above the minimum, reflects that the court failed to balance the retributive and rehabilitative purpose of its punishment." Because defendant has not pointed to any affirmative indication that the court did not consider the mitigating evidence before it, we must presume the court, in fact, considered it. *Jones*, 2014 IL App (1st) 120927, ¶ 55.

¶ 64    Here, the record shows the trial court carefully considered the mitigating evidence presented to it and, ultimately, found the seriousness of the offense and the need for deterrence

warranted the sentence imposed. Not only do we find the court did not abuse its discretion, we agree with its determination that the sentence was warranted under the circumstances of this case. As the trial court pointed out, defendant committed a senseless, cold-blooded act that was predicated on a perceived romantic rivalry, in which he lay in wait for Gorski before following and killing him. Further, defendant not only fabricated statements to police after the shooting, his trial testimony was not corroborated by any credible evidence and was wholly rejected by the jury.

¶ 65    As this court has repeatedly recognized, the seriousness of the offense is the most important sentencing factor (*People v. Contursi*, 2019 IL App (1st) 162894, ¶ 25), and a court need not reduce a sentence from the maximum even if mitigating facts are present (*People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993)). Though there existed some evidence for the court to consider in mitigation, including that emphasized by defendant in this court, the trial court was not obligated to place any more weight on those factors than on the seriousness of the offense and the need to deter others from committing similar crimes. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 64; *People v. Malin*, 359 Ill. App. 3d 257, 265 (2005); see also *People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 27 (the need for deterrence is proper factor to consider in imposing sentence). On this record, we cannot conclude the sentence imposed "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. Accordingly, we conclude the trial court did not abuse its discretion in imposing defendant's 78-year sentence.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 68    Affirmed.