2025 IL App (2d) 240427-U
No. 2-24-0427
Order filed November 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-3361 |
| KENNETH S. SEPLAK, | ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying defendant's postconviction petition after a third-stage evidentiary hearing.  Affirmed.

¶ 2    Defendant, Kenneth S. Seplak, appeals from the third-stage denial of his postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), arguing that he made a substantial showing of ineffective assistance of counsel, where counsel should have moved to suppress the seizure of his cellphone and presented defendant's testimony concerning its seizure.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 Defendant was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) in relation to the shooting of David Gorski, and he was sentenced to 78 years' imprisonment, which included a 25-year sentence enhancement based on a jury's finding that he personally discharged the firearm that caused Gorski's death. The case arose after police officers found Gorski unresponsive in the driver's seat of his vehicle, which was parked in the middle of a street in Libertyville around 11:25 p.m. on December 23, 2016. Police learned that, just before his death, Gorski had been on a date with Sandy Moreno at the AMC movie theater at Hawthorn Mall in Vernon Hills, about one-half mile south of where police found Gorski. Police spoke to Moreno around 3:45 a.m. on December 24, 2016, and, when asked if there was anyone who may have wanted to harm her or Gorski, she told them about defendant. A grand jury subsequently indicted defendant on three counts of first degree murder.

¶ 5                            A. Pre-trial Motions

¶ 6 Prior to trial, defendant filed motions to quash his arrest and suppress statements, arguing that he was placed in custody when there was no probable cause to believe he had committed any offense and that all subsequent evidence discovered was the product of his illegal arrest and should be suppressed. His cellphone, he argued, was seized without his permission while he and the police were at his home, and any information from his phone should be excluded from evidence.

¶ 7                            1. Officer Adam Boyd

¶ 8 At the hearing on defendant's motions, Adam Boyd, a police officer with the Village of Vernon Hills and a member of the Lake County Major Crimes Task Force, testified that, on December 23, 2016, he responded to the scene of Gorski's shooting. Gorski's family told police that he had been dating Moreno, who informed police that an ex-boyfriend had sent an inappropriate number of text messages and left a note on her car after stopping by unannounced.

¶ 9     The following day, at 6:30 a.m., Boyd and three other detectives went to Round Lake Beach to interview defendant. Kenneth Seplak, Sr. (Kenneth), defendant's father, opened the door. The officers explained in a conversational tone that they wanted to speak to defendant about a case they were investigating. Kenneth let them in and guided them back toward defendant's bedroom. Laura Seplak, defendant's mother, appeared, and the officers explained why they were there. Defendant then appeared in the doorway of his bedroom, and the officers stated that they wanted to speak to him about a case they were investigating and asked if he would come with them. Defendant, who was in his pajamas, agreed and asked if he could get dressed. The officers permitted defendant to get dressed.

¶ 10     According to Officer Boyd, none of the officers went into the bedroom with defendant. Defendant got dressed, "and then he came back out, and I think he asked if he could grab his cellphone and went back and got that, and then we left." They walked to an unmarked squad car and left. Defendant was not patted down before getting into the car, and, during the ride, defendant was not restrained or told he could not do anything. Nor was he forbidden from using his cellphone. Boyd's tone of voice with defendant was conversational. Defendant agreed to voluntarily go with police and never told them he did not want to go with them.

¶ 11     After they arrived at the police station, the officers directed defendant to an interview room. Boyd spoke to other officers, retrieved consent forms, and then entered the interview room. Busch and defendant were in the room. Boyd *Mirandized* defendant at 6:58 a.m. Defendant spoke to the officers until about 8:17 a.m., when he asked for an attorney. The interview was videotaped.

¶ 12     According to Boyd, defendant initially stated that, on December 23, 2016, he was home all day and never left. He also stated that he had his cellphone with him all day and that no one else had his phone. Later in the interview, defendant stated that, at around 3 p.m., he went to get gas

and did not go anywhere else. He mentioned that he had spoken to his friend, Keith Garcia, that day about a snowmobile; defendant owed Garcia money for damage he caused to Garcia's snowmobile. Defendant also stated that he had messaged Moreno that day about helping her sell her car. He stayed home that night.

¶ 13    Boyd asked defendant how he had met Moreno, and defendant explained that they met when he delivered beer to the gas station where she worked. He also stated that he had loaned Moreno a lot of money (specifically, about $13,000 for a divorce attorney, a traffic accident, and her children), had a romantic interest in her, and that they had been on several dates. Defendant stated that he texted her that day, specifically, about one time. Defendant also told Boyd that, during the relationship, he had stopped by Moreno's home or work unannounced and left a note on her car. She responded by asking him not to stop by unannounced and not to send too many text messages. Defendant stated that he stopped sending too many texts. Defendant believed that Moreno would repay him the money when she received her tax refund.

¶ 14    Boyd asked defendant if he would allow him to examine his cellphone, and defendant agreed and signed a consent form. During the interview, there was discussion about an attorney, and Boyd stated that it was up to defendant if he wanted an attorney.

¶ 15    When asked if Laura, rather than defendant, retrieved defendant's cellphone at the home, Boyd testified, "I remember him getting it. I don't recall." While searching defendant's phone at the police station, Boyd discovered that defendant had sent Moreno a text message at 9:20 p.m. on December 23. There was also a reminder on his phone to talk to Moreno at 8 a.m. Defendant had called Garcia at 12:01 a.m. on December 24 and sent him a text message. Boyd also reviewed the Google Maps application on the phone and learned that, just after 8 p.m., the phone was in Vernon Hills at the AMC Hawthorn movie theater for about 20 minutes. Afterwards, the phone was in the

area of defendant's residence and then back to the movie theater over the next 50 minutes. There was also a line leaving the theater, going northbound in Route 21, then making a U-turn southward just north of the area where Gorski was shot and at the time he was shot. Between midnight and 1:14 a.m., the phone was in Antioch in the area of Garcia's residence. When Boyd presented defendant with the evidence from his phone, defendant asked for an attorney and the questioning stopped.

¶ 16                          2. Detective Michael Busch

¶ 17    Michael Busch, a detective with the Village of Mundelein police department and a member of the Lake County Major Crimes Task Force, went with Officer Boyd to defendant's home. Defendant was cooperative. He got dressed and agreed to go with the officers to the police station. No one touched defendant, and he was not handcuffed. Defendant had his cellphone and keys.

¶ 18    Busch further testified that, at some point, defendant got into the back of Busch's unmarked SUV with Boyd. He was not guided in. Before he entered the vehicle, the officers asked defendant if they could keep his cellphone up front with them; he was not searched. Busch explained that cellphones are easily manipulated, police do not know what people are doing, and, so, it is best to keep it near the officers. In this case, the officers asked for the phone, and defendant "just gave it to us." He did not hesitate. During the drive, defendant never asked for the phone and never asked to make a call. At the station, the phone was kept in the detectives' office with defendant's other items that the officers collected once they arrived. Defendant did not ask for his phone.

¶ 19    On cross-examination, Busch testified that defendant's phone was given to the officers when they were in the vehicle. When asked if Laura actually retrieved the phone, Busch testified, "I don't know. I don't recall that, no. It's possible, but I don't recall that." Busch could not recall if, before they left the house, Kenneth told defendant to call. Nor could he recall if, after Kenneth

told defendant to call, Laura retrieved the phone and it was then taken by police. "I don't recall if she gave me the phone or if [defendant] gave me the phone, but my recollection is that [defendant] gave me the phone."

¶ 20                                        3. Detective Shaun Knight

¶ 21    Shaun Knight, a detective with the Village of Lake Zurich and an investigator with the Lake County Major Crimes Task Force, testified that, at 11:30 p.m. on December 23, 2016, he responded to Milwaukee Avenue in Libertyville, where he observed a vehicle in the middle of the road on a divided highway. The front passenger side window was broken. He and other officers searched the area, looking for bullet casings and other evidence. Next, Knight went to Gorski's residence, but could not get inside the apartment or speak to anyone residing in the apartment. Knight then went to Gorski's parents' house. He learned from Gorski's parents that Gorski was in a relationship with Moreno, who had a couple of children and lived near Wauconda.

¶ 22    Knight next followed up with Moreno. He informed her that Gorski was killed. She was shocked and distraught. She told Knight that she and Gorski had seen a movie in Vernon Hills at the Hawthorn Mall. The movie started around 8:45 p.m. on December 23, 2016, and ended at about 11 p.m. After the movie ended, they walked out of the theater and into the parking lot. They each went to their vehicles, and Moreno drove to Gorski's apartment to wait for him. She waited for about 30 minutes, tried calling him a couple of times, and became upset. Moreno never saw Gorski again.

¶ 23    Moreno told Knight that she had met Gorski while working at a gas station in Island Lake. He was a regular customer. During the conversation with Moreno at her apartment, her husband was present. She explained that they had been separated for some time, but that he still lived there because they were both on the lease and had children together.

¶ 24    Knight further testified that Moreno came to the Wauconda police department to be interviewed. She became upset when police asked her who committed the crime, wrote down "Kenny," and later identified defendant and provided a phone number. Moreno explained that, while working at the gas station, defendant worked for a liquor distributor and that they initially became friends and exchanged phone numbers. Later, they went on a couple of dates. She saw him as a friend. Defendant gave her money to help pay bills and for her divorce. Moreno characterized defendant as a stalker, explaining that he had shown up to her work unannounced three times. He came with a gift, would not leave when co-workers asked him to leave, but left after Moreno confronted him. Moreno also told Knight that defendant had placed a note on her vehicle's windshield at her apartment. She believed this was odd, because she had never told defendant where she lived. This concerned her. Moreno told defendant that she would go to the police if he did not leave her alone. He apologized and asked her to return some of the money he had given her. Moreno also told police that defendant sometimes sent as many as 25 text messages per day. She would not reply. He texted that he wanted to be with her, sent sexually explicit messages, and Moreno responded that she did not want that sort of relationship with him. She also blocked his phone number. Moreno showed Knight the blocked messages on her phone. Between September 30 and the date of Gorski's death, defendant had sent Moreno about 196 blocked texts.

¶ 25                    4. Sergeant Jason Kapusinski

¶ 26    Jason Kapusinski, a sergeant with the Village of Libertyville and an investigator with the Lake County Major Crimes Task Force, testified that he learned that both defendant and Garcia were interviewed at the Round Lake Beach police department and that defendant had asked for an attorney at some point. Kapusinski also learned that defendant and Garcia were taken from Round

Lake Beach to the Vernon Hills police department because Libertyville police did not house individuals in custody overnight.

¶ 27　On December 27, 2016, Kapusinski first came into contact with defendant and Garcia when they were brought to the Libertyville police department at about 2:41 p.m. They were brought in separately, and the booking room area was videotaped. At about 5:44 p.m., Kapusinski went into the booking room and had defendant removed from the cell. He gave defendant a ticket, *i.e.*, the charge for homicide and paperwork regarding the seizure of his vehicle. Defendant made a statement regarding telling his side of the story. Kapusinski explained what would occur in the process of his case. Kapusinski testified that, in the video, defendant is seen pointing in the direction of Garcia's cell and stated that Garcia did not have anything to do with this. Defendant also stated that this was not first degree and then asked to call his parents.

¶ 28　The murder weapon was found in a vehicle in a garage at Garcia's house. However, Garcia was arrested for cannabis and never charged with obstructing justice or hiding a gun in his car. Every time that defendant was moved, Garcia was also moved to the same location. (They were in separate vehicles and placed in cells near each other.) From Vernon Hills, they were taken to Libertyville.

¶ 29　Kapusinski testified that the police wanted Garcia to provide information regarding what happened. They placed him two cells away from defendant at Vernon Hills, where they could hear each other. On December 26, after Garcia had asked for his attorney, another police officer told Garcia that police just wanted him to help himself and someone else added that prosecutors and judges would be looking at the case and wanting to know if Garcia was cooperative.

¶ 30　　　　　　　　　5. Detective Edward Swider

¶ 31    Edward Swider worked as a detective in the Libertyville police department on December 23, 2016. He transported Garcia on December 24, 2016, from the Round Lake Beach police department to the Vernon Hills police department. On December 27, 2016, Swider assisted in booking Garcia and defendant into the Libertyville police department. While booking defendant, defendant said to Swider that, if he could speak to his attorney, he would tell his side of the story. Swider let defendant call his attorney, but the attorney did not respond. Swider informed defendant that he was being charged with first degree murder. Once defendant was back in his cell, he called out, stating that Garcia had nothing to do with this. Swider responded that he could not speak to him because defendant had asked for an attorney.

¶ 32                                6. Officer Anthony Baratti

¶ 33    Anthony Baratti, a police officer with the Village of Libertyville, testified that, while assisting in booking defendant, defendant gestured toward Garcia's cell and stated that he, *i.e.*, Garcia, did not do anything.

¶ 34                                7. Kenneth Seplak, Sr.

¶ 35    Kenneth, defendant's father, testified that, on December 24, 2016, officers knocked on the door of his home. He got out of bed and answered the door. Three officers were at the door, and another one was walking down the driveway. Kenneth did not give anyone permission to go around to the back of the house. At the door, a police officer stated that they needed to see defendant. Kenneth let them in, and he called out to defendant. Defendant exited his bedroom, and police stated that they needed to speak to him at the station. After a while, Laura got up. Kenneth told defendant to go with the officers, and defendant went to his bedroom to get dressed. One of the officers followed him into his bedroom. After about two or three minutes, defendant

and the officer exited the bedroom. The other two officers were by the front door. An officer stated that police needed to see defendant at the police station and needed him to come with them.

¶ 36 Laura yelled out to defendant to take his phone so he could call Laura and Kenneth to ask them to pick him up. She had the phone in her hand. One officer stated that he would take the phone and then took it from Laura's hands. He did not ask defendant's permission to take the phone, and defendant did not give him permission to take it.

¶ 37 As they left the house, the two officers exited first, then defendant, and then the final officer. The officer never told defendant, age 37, that he did not have to go with them or tell him that he could speak to an attorney before going with them.

¶ 38                                          8. Trial Court's Ruling

¶ 39 On March 21, 2019, the trial court denied defendant's motions, finding that, at his home, defendant voluntarily accompanied the officers to the police station for questioning, and, at the station, he voluntarily signed a consent to search his cellphone. The court determined that defendant was neither arrested at his home, nor upon arrival at the police station interview room. At his home, the officers engaged in polite conversation with defendant and his parents, explained the nature of their visit, and asked to speak with defendant. They asked if he would accompany them to the station. The court noted that there was nothing other than voluntary activity at the home, "even the part where the officers had the phone that was provided by the defendant's mother. Officers did not compel him to leave." By agreeing to accompany the police, the court found, defendant could not have believed he was under arrest. "Implicit in that agreement to accompany to the police station was an acknowledgement that he could also refuse to go."

¶ 40 At the station, the court further found, although the door had a lock, defendant engaged with the officers for about one hour, and nothing suggested that defendant was detained against

his will. The encounter was non-confrontational and not custodial. When the officers asked if he had any knives or related items, defendant emptied his pockets and they gave defendant his lip balm when he asked for it.

¶ 41    The court determined that defendant was placed under arrest after the officers learned certain information from witnesses and data derived from his cellphone, which provided the probable cause to arrest him. The court also denied defendant's motion to suppress statements made prior to being given *Miranda* warnings, finding the statements were the product of voluntary non-custodial communication.

¶ 42                                    B. Trial

¶ 43    The State introduced evidence that defendant met Moreno, who was married, in 2014 and that they started seeing each other socially one year later. Text messages between defendant and Moreno showed that defendant was infatuated with Moreno, he gave her about $13,000 over several months, and he expressed sexual desire for her. In September 2016, Moreno told defendant that she did not want to have sex with him, would return his gifts to him, and pay him back the money he lent her. Defendant's texts to her then became incessant, prompting Moreno to block his number that month. Defendant continued to text Moreno and showed up on several occasions, without invitation, at the gas station where she worked. He also left a note on her car when it was parked outside her apartment; Moreno had not given defendant her address.

¶ 44    On December 23, 2016, Moreno was dating Gorski and they met at the AMC theater to see a movie. They met at the theater at around 8 p.m., left the theater around 10:54 p.m., and walked separately to their cars. Moreno drove to Gorski's apartment and, when he did not arrive and she could not contact him, she left.

¶ 45    After speaking with Moreno, police went to defendant's house at around 6 a.m.  He agreed to go to the station.  There, defendant waived his *Miranda* rights and told police that he had not left his house all day, other than to get gasoline, and had his phone with him all day.  Defendant also told the officers that he had sent Moreno three texts while at home and spoke to his friend, Garcia.  He told police that he was in an exclusive dating relationship with Moreno, had lent her $13,000, and acknowledged he may have sent her too many text messages.  Defendant consented to a search of his cellphone and, later, the State obtained a search warrant to extract data from the phone.  During booking, defendant told an officer that Garcia had nothing to do with this and, later, while in a holding cell, called for a detective and told the detective that Garcia had nothing to do with this charge.

¶ 46    A location data analysis of defendant's phone showed that he had not been truthful about his activities on December 23.  The data showed that, between 7:20 p.m. and 2:04 a.m. on the night of the shooting, defendant travelled several times, between his home, Moreno's apartment, the theater, the crime scene, and Garcia's home, while also texting Moreno several times.

¶ 47    Police obtained video surveillance footage of the parking lot at the theater and from nearby businesses.  The footage corroborated the location analysis of defendant's phone, showing an SUV that was consistent with defendant's SUV's travel about the parking lot near the theater around 8:30 p.m. and 10:35 p.m.  It also showed the SUV turning around at a business just north of the crime scene at 11:01 p.m. and traveling back south on Milwaukee Avenue.  Around 11:15 p.m., the SUV travelled north on Milwaukee Avenue, past the crime scene, before traveling south a short time later.

¶ 48    Garcia testified that, on the night of the shooting, defendant asked him to hold a Ziplock-like bag containing a revolver and ammunition, explaining that he had been shooting towards a

tree in Wisconsin. Defendant arrived at Garcia's residence shortly after midnight, and Garcia put the bag under the driver's seat of a vehicle in his garage. There was also a large quantity of marijuana in the vehicle. On the morning of December 24, 2016, police arrived at Garcia's home. He told them that he knew defendant, who had been there the night before. He initially stated that defendant did not leave anything at the house, but, while police were waiting for a search warrant, Garcia led them to his garage, where he removed the marijuana and the bag with the revolver and ammunition. Garcia was transported to the police station and placed in a holding cell near defendant's cell. They conversed, and defendant told Garcia that this was over a girl who had been messing around with him even though he had helped her out financially.

¶ 49    Forensic testimony reflected that the bullet recovered from Gorski's body was fired from the firearm recovered from Garcia's home.

¶ 50    During defendant's case-in-chief, defendant testified that Moreno never told him that she had blocked his texts or that she did not want to see him again. On the night of the shooting, defendant drove to Moreno's home, but, on the way, saw her driving in the opposite direction and followed her to the theater. He then returned home and, later, returned to the theater. When the movie let out and after Moreno had driven away, defendant approached Gorski and asked what was going on, as he had seen him with Moreno. An argument ensued, Gorski shoved defendant, and they fought. Eventually, defendant ran to his vehicle and drove toward Milwaukee Avenue. Defendant further testified that Gorski followed him, blocked him, and, eventually, defendant grabbed the revolver from his center console. After more chase and swerving, defendant swerved his vehicle onto the roadway, was flung into the driver's door, and his gun went off. He lingered in the area and then retrieved his phone and called Garcia. He later drove to Garcia's house and

asked him to take the revolver and a box of bullets. Afterward, defendant drove around, including to Moreno's house, and then went home.

¶ 51                                    C. Direct Appeal

¶ 52    After he was convicted and sentenced, defendant appealed to this court, challenging his sentence. This court affirmed. *People v. Seplak*, 2021 IL App (2d) 190910-U.

¶ 53                          D. Postconviction Proceedings

¶ 54    On June 26, 2023, defendant filed a postconviction petition, alleging that trial counsel was ineffective for failing to present defendant's testimony at the hearing on his motions to quash arrest and suppress evidence. He asserted that his testimony would have corroborated and supported an argument that he was placed under arrest in his home in the absence of probable cause or a valid warrant. Defendant argued that his phone was seized at the time of his invalid arrest and was a crucial piece of evidence used to obtain his conviction. It was taken from his mother without her or defendant's consent. Defendant asserted that both he and his mother were willing to testify at any pretrial hearing, and he alleged that trial counsel would not let him testify. Defendant also argued that appellate counsel was ineffective for failing to raise numerous issues.

¶ 55    Defendant attached to his petition his own and his mother's affidavits. In his affidavit, defendant averred that he was represented at trial by Steven McCollum and Daniel Hodgkinson. He wished to testify at his pretrial hearings, but did not testify because his lawyers would not allow it. The police took his cellphone from his mother's hand without defendant's consent. At the police station, he repeatedly asked for his phone and to make a phone call, but the police denied defendant's requests. The contents of the phone were used against him at trial. Finally, defendant averred that appellate counsel did not raise any issue regarding defendant's arrest or the motion to quash and suppress.

¶ 56    Laura, defendant's mother, averred that, on December 24, 2016, police entered her home without a warrant. She was holding defendant's phone at some point, and the police took the phone from her hand without permission or consent. She told trial counsel this information before any hearings occurred. Laura was willing to testify at any hearing or at trial, but was not called as a witness at any hearing.

¶ 57    The trial court granted the State's motion to dismiss as to Laura's potential testimony and denied the motion as to the issue of whether counsel was ineffective for failing to present defendant's testimony. It noted that defendant's conversations with counsel were outside the record and that it needed to weigh the potential testimony at an evidentiary hearing and consider if there was any prejudice.

¶ 58                      1. Defendant's Case - Defendant

¶ 59    The stage-three evidentiary hearing on defendant's postconviction petition was held on June 24, 2024. Defendant, age 44, testified that, prior to trial, his attorneys filed motions to quash arrest and suppress evidence. They did not file a motion to quash the *seizure* of any evidence, specifically, the cellphone. Prior to the hearing, defendant told his attorneys that he wanted to testify. According to defendant, counsel stated that they were not going to have defendant testify but would, instead, put his father on the stand. Defendant did not testify at the hearing on the motions; this was his attorneys' choice, not defendant's choice.

¶ 60    Next, addressing the morning of December 24, 2016, defendant testified that he heard banging on the door shortly after 6 a.m., and then heard his father get up and answer the door. Afterward, Kenneth came to defendant's room and stated that the police wanted to speak to him. Defendant walked to the living room and saw three police officers standing there with his father. The police were in plain clothes and had guns on their belts. One of the officers, Busch, stated

that defendant needed to go with them to the police station. When defendant asked why, the officer stated that they would discuss it at the station. Defendant asked to get dressed, and Officer Boyd followed him to his bedroom. When defendant noted which clothes he was going to put on, the officer checked the pockets. Defendant got dressed, and the officer directed him back to the living room. While the group was leaving, defendant heard his mother get up and ask what was going on. Defendant also asked again why the officers were at his home. One officer responded that he needed to come with them to the station. Defendant asked why, and the officers responded that they needed to ask him some questions and that they did not want to ask them in front of his parents. According to defendant, he stated, "I don't feel comfortable" and that he did not want to go to the station. The officers responded that they were not going to leave without him. Defendant's father urged defendant to go with the officers.

¶ 61    When defendant put on his shoes, his father stated, "Take your phone." His mother arrived with defendant's cellphone, and Boyd stated, "I'll take that" and took the phone as defendant walked out the front door. The officer never asked if he could take the phone, and defendant did not give him permission to take the phone.

¶ 62    The officers walked defendant to the end of the driveway, where two additional officers from behind the house joined them. Defendant was taken to the Round Lake Beach police station; they entered via the sally port. Once there, he asked if he could use his cellphone to call his father because he did not feel comfortable being there. One officer replied, "No, not now" because they first had to take care of other things. Officer Boyd had defendant's phone at this time. Defendant was taken to a room (the officer used a key to open it) and was searched.

¶ 63    At some point, defendant signed a consent form to search his phone; he did not sign a consent to seize it. Later, he was taken to the Vernon Hills police station and placed in a holding

cell near Garcia, who testified against him at trial. Also, at trial, the State introduced evidence from defendant's cellphone and his statements to police.

¶ 64 On cross-examination, defendant conceded that his father testified at the motion-to-suppress hearing that the officer took the phone from his mother, just as defendant testified at the stage-three hearing. Defendant also conceded that, at the stage-three hearing, he testified to the same facts that his father had testified to at the motion-to-suppress hearing.

¶ 65 Addressing trial counsel, defendant agreed that counsel explained to him that they would not have defendant testify at the hearing but, instead, would have his father testify to say the same things that defendant would say. Defendant never told his attorneys during the hearing that he wanted to testify because he had something *new* to provide. Nor did he say after the hearing (and before trial) that he should have testified at the hearing or told the trial judge that he had a problem with counsel because they would not let him testify.

¶ 66 On re-direct examination, defendant testified that, at the motion-to-suppress hearing, Officer Boyd testified that defendant was not restrained and not prevented from using his cellphone at all. Boyd also testified that defendant had his cellphone when he left the house and asked defendant if he could keep the phone up front in the police car. Defendant also testified that Officer Busch did not ask if police could keep the cellphone up front in the car.

¶ 67 On re-cross examination, defendant testified that his father never gave consent to the police to take the phone. Busch, according to defendant, testified that defendant handed him the phone in the vehicle after he asked for it. Defendant testified, "I never had it in the police car. They took it in my house."

¶ 68                 2. State's Case - Attorney Steven McCollum

¶ 69　McCollum testified that the defense's goal at the motion-to-suppress hearing was to establish that defendant was under arrest at the earliest possible time. He was sure there were discussions with defendant regarding the witnesses who would be called by both the State and the defense at the hearing on the motions. Defendant did not advise McCollum that he wanted to testify at the hearing. They discussed who would be called at the hearing, how the officers would testify, etc. Defense counsel explained to defendant why it would not be good for him to testify and that it was not necessary. There was testimony from the officers and from defendant's father concerning the events at the house.

¶ 70　McCollum explained that defendant's father was called instead of defendant because it was not necessary to expose defendant to cross-examination at the hearing; no decision had been made at that point if defendant would testify at trial; the police officers testified about the facts that McCollum wanted to get before the court and were "pretty clear on their testimony concerning the issues"; and defendant's father was available to testify, as was his mother, if necessary. Defense counsel did not feel it was necessary to bring up either defendant's testimony or his mother's testimony "in order to get the points we wanted to make before the judge." Defense counsel were concerned that, if defendant testified, cross-examination might be dangerous for him and that it was not a necessary risk under the circumstances. Defendant's father was able to present the same facts about what happened at the house regarding the phone as defendant and police would have.

¶ 71　Next, addressing the period during which defendant was in the police car, McCollum testified that he did not call defendant to testify about that period because his parents observed defendant getting into the car and the officers testified that they put him in the back seat and one officer got in next to him.

¶ 72    On cross-examination, McCollum testified that his objective with the motions was to show that defendant was under arrest not only at the home but also at the police station, where he was placed in a locked room after his phone, wallet, etc., were taken from him.

¶ 73    Addressing the cellphone's seizure, McCollum believed that, when defendant left the house, he did *not* have his phone. He recalled that the testimony was clear that the phone was taken from defendant's mother without any prior consent from anyone. McCollum further testified that his concern about the officer taking the phone from defendant's mother was that it showed that defendant was being treated like he was in custody. It also did not show consent to turn over the phone.

¶ 74                                    3. Trial Court's Ruling

¶ 75    The trial court denied defendant's petition, finding that defendant added no testimony that was not already presented to the court by the police officers and his father. It was not ineffective, the court determined, to fail to call a client in a murder case and expose him to cross-examination, merely to present cumulative evidence that the police did not seek consent to seize the phone. There was also no prejudice from failing to call defendant. Also, the court noted that no officer testified that there was consent to take the phone.

¶ 76    The court also disagreed that an attenuation hearing was warranted, where nothing happened with the phone in the six hours between when the phone was taken and consent was obtained. Merely suppressing the physical taking of the phone "would be a pyrrhic victory because of the subsequent consent." Given the consent, the court further found, there was no ineffective assistance; it was trial strategy. "The Defense Counsel clearly knew that they had to deal with a videotaped consent." Also, the court found that there was no prejudice because the police did not search the phone until after defendant consented. Defendant appeals.

¶ 77                                    II. ANALYSIS

¶ 78    Defendant argues that the trial court erred in denying his postconviction petition.  He contends that defense counsel should have presented his testimony concerning the seizure of his cellphone and should have moved to quash the seizure of the phone, where the evidence obtained from the phone would have been suppressed.  Defendant asserts that the illegality of the seizure of his cellphone was not dissipated by his alleged consent to search that phone six hours later.  For the following reasons, we reject defendant's arguments.

¶ 79    The Act provides a means by which a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights.  *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005).  The Act sets forth three stages of review.  At the first stage, the trial court may summarily dismiss a postconviction petition as frivolous or patently without merit.  725 ILCS 5/122-2.1(a)(2) (West 2022).  If the petition is not dismissed, it advances to the second stage.  *Id.* § 122-2.1(b).

¶ 80    At the second stage of a postconviction proceeding, the State may move to dismiss a petition or answer a petition pending before the trial court.  *Id.* § 122-5.  At this stage, the trial court must determine whether the petition and the accompanying documentation make a " 'substantial showing of a constitutional violation.' "  *People v. Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)).  If the petition satisfies this standard, the defendant is entitled to a third-stage evidentiary hearing at which the trial court acts as the factfinder and determines whether the evidence introduced demonstrates that the defendant is entitled to relief.  *Id.* ¶ 34.

¶ 81    At the third stage of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation.  *People v. Pendleton*, 223 Ill. 2d 458, 473

(2006). The defendant is entitled to a hearing where the trial court "may receive evidentiary proof via affidavits, depositions, testimony, or other evidence, and may order the petitioner brought before the court." *People v. Gerow*, 388 Ill. App. 3d 524, 527 (2009). We defer to "the trial court's factual findings because the trial court stands in the best position to weigh the credibility of the witnesses." *In re Floyd*, 274 Ill. App. 3d 855, 867 (1995). Accordingly, "[a] judge's factual findings and credibility determinations made at a third-stage evidentiary hearing of a postconviction proceeding should be disturbed only if manifestly erroneous, that is, only if the court committed an error that is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Eubanks*, 2021 IL 126271, ¶ 47.

¶ 82    A defendant who raises an ineffective-assistance-of-counsel claim must satisfy the two-prong test promulgated in *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Specifically, the defendant must show that counsel's performance was objectively unreasonable and that there is a reasonable probability that, but for counsel's unreasonable performance, the result of the underlying proceeding would have differed. *Id.*; *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). "To satisfy the deficient performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth amendment.' " *People v. Dupree*, 2018 IL 122307, ¶ 44 (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). Courts assess counsel's performance based on the "prevailing professional norms" at the time of representation (*People v. Domagala*, 2013 IL 113688, ¶ 36), without the "distorting effects of hindsight" (*Strickland*, 466 U.S. at 689). With respect to the prejudice prong, " '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.' " *People v. Johnson*, 2021 IL 126291, ¶ 55 (quoting *Strickland*, 466 U.S. at 693). Instead, "[s]atisfying the prejudice prong necessitates a showing of

actual prejudice, not simply speculation that [the] defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81. A defendant must satisfy both prongs of the *Strickland* test—deficient performance and prejudice—to prevail on an ineffective-assistance-of-counsel claim, and the failure to satisfy either prong invalidates his or her claim. *People v. Veach*, 2017 IL 120649, ¶ 30.

¶ 83    In reviewing a claim of ineffective assistance of counsel, this court reviews counsel's actions under the totality of the circumstances of the individual case. *People v. Shatner*, 174 Ill. 2d 133, 147 (1996). Judicial scrutiny of counsel's performance is highly deferential, and counsel's trial strategy is given a strong presumption of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Decisions regarding what evidence to present and which witnesses to call are matters of trial strategy (*People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005)), and counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary (*People v. Pecoraro*, 175 Ill. 2d 294, 324-25 (1997)). Strategic choices made by counsel after having made a thorough investigation are "virtually unchallengeable." *People v. Towns*, 182 Ill. 2d 491, 514 (1998).

¶ 84    Where, as here, an ineffective-assistance-of-counsel claim is predicated on counsel's conduct during pretrial suppression proceedings, a defendant must show a reasonable probability that, had counsel not committed the purported error, the trial court would have granted the motion to suppress and the result of the trial would have differed if the suppressed evidence had not been introduced. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). The failure to introduce evidence at a suppression hearing can, in certain circumstances, constitute ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000).

¶ 85    Here, defendant argues that trial counsel was ineffective for failing to (1) present his testimony at the hearing on the motions to suppress; and (2) move to quash the seizure of his cellphone and to suppress evidence obtained from the phone. He contends that, had his testimony been presented and had trial counsel moved to quash the seizure of his cellphone and suppress the evidence retrieved from the phone, the State would have been deprived of crucial evidence as to his movements on the night of the offense and the trial outcome would have been different.

¶ 86                    A. Failure to Present Defendant's Testimony

¶ 87    Specifically, defendant first asserts that his testimony about the seizure of the cellphone, which was a crucial piece of evidence, would have corroborated and supported the argument that he was actually placed under arrest in his home in the absence of probable cause or a valid warrant. We reject defendant's argument.

¶ 88    The trial court's finding as to counsel's decision not to present defendant's testimony was not manifestly erroneous. In his postconviction petition, defendant asserted that trial counsel was ineffective for failing to present defendant's testimony at the pretrial hearing. Defendant argued that his testimony should have been presented because it would have corroborated and supported his argument that he was arrested in his home without probable cause or a valid warrant and that his phone was seized at the time of his invalid arrest and was crucial evidence used to obtain his conviction. At the stage-three hearing, defendant testified that he told his trial attorneys that he wanted to testify, but that counsel decided that Kenneth would testify instead. He also related the events on the morning of December 24, 2016, noting that officer Boyd took his cellphone from Laura without permission, as defendant and the police walked out the door of his parents' home and that this was contrary to the officers' testimony at the hearing that they took the phone from defendant in the police car. At the stage-three hearing, defendant conceded on cross-examination

that his version of the events was *identical* to the version Kenneth testified to at the suppression hearing, most notably, that the officer took the phone from defendant's mother. Defendant also testified that trial counsel explained to him that he would not testify and that Kenneth would testify to the same things that defendant would have testified to. He also conceded that he never told his attorneys that he wanted to testify because he had something new to provide.

¶ 89 McCollum testified that defendant did not inform him that he wanted to testify at the hearing, but he and co-counsel discussed who would be called to testify. McCollum also testified that they explained to defendant why it was not necessary for him to testify and that his father would be testifying about the events at his parents' house. Counsel did not want to expose defendant to cross-examination and the risks it entailed for defendant's case, where his father was available to testify. Indeed, defendant's father, McCollum testified, presented the same facts about what occurred at the house regarding the phone as defendant.

¶ 90 Given the evidence, including defendant's concession that his testimony (that police seized his phone from his mother without consent) would have been identical to and cumulative of his father's testimony, defendant cannot show that the trial court's denial of his petition was erroneous. First, the court, which was in the best position to assess witness credibility, did not err in determining that trial counsels' decision to not have defendant testify at the suppression hearing was trial strategy and did not constitute deficient performance, where McCollum recounted his concerns about subjecting defendant to cross-examination. See *People v. James*, 2023 IL App (1st) 192232, ¶ 48 (a reasonable justification for counsel not to call a defendant at a suppression hearing is that counsel may want to avoid inconsistencies in the defendant's testimony that the State could use at trial to impeach him or her). Second, the trial court did not err in finding that defendant did not establish prejudice, where his cumulative and identical evidence would not have

changed the outcome of the motion to suppress or the trial. See *People v. Smith*, 195 Ill. 2d 179, 190-91 (2000) (rejecting the defendant's claim that his attorney rendered ineffective assistance when he failed to call a witness to provide cumulative testimony, because the defendant could not satisfy the prejudice prong of the *Strickland* test).

¶ 91                              B. Failure to Move to Suppress Seizure of Cellphone

¶ 92    Next, defendant asserts that the seizure of his cellphone was done without consent, a warrant, or exigent circumstances and was, therefore, unconstitutional, and trial counsel was ineffective for failing to move to quash the seizure of the phone. He argues that the trial court erred in finding that his subsequent consent, six hours later, to search the phone negated any potential prejudice. Defendant also argues that this issue should be resolved by applying the attenuation doctrine. See *In re Jarrell C.*, 2017 IL App (1st) 170932, ¶ 24 (doctrine, which is an exception to the warrant requirement, allows for the admission of evidence obtained unlawfully when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence that was obtained).

¶ 93    We conclude that defendant's argument that counsel was ineffective for failing to move to suppress the seizure of his cellphone fails because the court's ruling that he failed to show deficient performance was not manifestly erroneous. Police may temporarily seize evidence, including electronic devices, to preserve the evidence and prevent its destruction. See *Riley v. California*, 573 U.S. 373, 388 (2014) (noting that the defendants' concession that the police could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant was a "sensible concession"); *United States v. Fletcher*, 978 F.3d 1009, 1019 (6th Cir. 2020) (noting that

the government's interest in preventing the destruction of evidence is sufficiently addressed by seizing the phone, not searching it); *United States v. Knowles*, 207 F. Supp. 3d 585, 604 (D. S.C. 2016) (collecting cases) (courts routinely allow warrantless seizures of laptop computers and other electronic devices under the exigent circumstances doctrine because of the fragile and easily destructible nature of digital evidence at issue); *cf. People v. Butler*, 2015 IL App (1st) 131870, ¶ 44 (exigent circumstances justifying a warrantless search did not exist; officer did not merely seize the defendant's cell phone and secure it until a warrant could be obtained, but also immediately searched its contents). Here, Moreno had informed police that defendant, her former boyfriend, had sent her numerous text messages and engaged in other concerning behavior. The police reasonably could have determined that defendant's cellphone contained important evidence related to Gorski's shooting and that the evidence needed to be preserved. They seized the phone but did not search its contents until after defendant had signed a consent to search. Accordingly, the trial court's determination that defendant failed to show that trial counsels' performance was deficient was not manifestly erroneous. Further, because we conclude that defendant's ineffective-assistance claim fails (as there was no illegal seizure or search), we need not address defendant's argument concerning the attenuation doctrine.

¶ 94     Finally, given that we find no manifest error in the trial court's resolution of defendant's claims concerning trial counsels' performance, we cannot conclude that appellate counsel was ineffective for failing to challenge that performance on direct appeal. See *People v. White*, 2021 IL App (1st) 170903, ¶ 38 (if the underlying claim would not have succeeded on direct appeal, then appellate counsel was not ineffective for failing to raise it).

¶ 95                                III. CONCLUSION

¶ 96     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 97     Affirmed.